IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Case No. 20-cv-03594-PAB-KMT

ETIENNE HARDRE, and
SDG MURRAY, LTD d/b/a LOCALS BARBERSHOP, a Colorado limited liability company,

    Plaintiffs,

v.

BETSY MARKEY, in her official capacity as Executive Director of the Colorado Office of Economic Development and International Trade, and
JARED POLIS, in his official capacity as Governor of Colorado,

    Defendants.

_____

**ORDER**
_____

This matter is before the Court on plaintiffs' Motion for Preliminary Injunction [Docket No. 27] and defendants' Motion to Dismiss [Docket No. 42].  The Court held a hearing on the preliminary injunction motion on April 6, 2021.

## I.  BACKGROUND

On December 7, 2020, Colorado Governor Jared Polis signed into law Senate Bill 20B-001.  *See* Docket No. 28-1 at 25.  Among other provisions, S.B. 20B-001 set aside economic relief, in the form of payments, grants, and loans, for minority-owned businesses to assist such businesses with the economic difficulties resulting from the COVID-19 pandemic.  *See id.* at 21-22.  On December 8, 2020, plaintiffs, a barbershop in Colorado Springs, Colorado, and its majority owner, Etienne Hardre, who is white, filed this case.  *See* Docket No. 1.  Plaintiffs challenged S.B. 20B-001 on the grounds

that it violated the Equal Protection Clause of the United States Constitution by limiting COVID-19 relief to defined groups of racial minorities, thereby excluding Mr. Hardre from the ability to apply for such relief. *See id.* at 6.

In January 2021, the Colorado General Assembly modified S.B. 20B-001. This modified version, known as Senate Bill 21-001 ("the Act") was signed into law on January 21, 2021. *See* Docket No. 28-2 at 13. Rather than setting aside relief funds for minority-owned businesses, the Act provides economic relief to "disproportionately impacted business[es]." *See* Colo. Rev. Stat. § 24-48.5-127(2)(c). To qualify as a disproportionately impacted business, the business must have "been disproportionately impacted by the COVID-19 pandemic" and meet one of seven criteria.[1] *See id.* One of those criteria is to be a minority-owned business. *See id.*, § 127(2)(c)(II). A minority-owned business is one that is "at least fifty-one percent owned, operated, and controlled by an individual who is a member of a minority group, including an individual who is African American, Hispanic American, or Asian American." *Id.*, § 127(2)(g).

If a business meets the criteria for being considered disproportionately impacted, it will be eligible for three types of relief: (1) relief payments for those who have been "most impacted by COVID-19" and "have lacked meaningful access to federal loans and grants under the CARES Act"; (2) grants and loans "for start-up and growth capital"; and (3) funds for "technical support". *See id.*, §§ 127(3)-(4). The Act sets aside $4 million from Colorado's general fund for these three categories of economic

---

[1] Examples include having "five or fewer employees, including the business owner," being "located in an economically distressed area," or "[t]he business owner ha[ving] had diminished opportunities to access capital or credit." *Id.*

2

assistance. *See id.*, § 127(5). The Colorado Office of Economic Development and International Trade ("OEDIT") is tasked with administering funds, "establish[ing] a process" for applying for the funds, determining the "information and documentation required" to "demonstrate eligibility," and for "establish[ing] policies setting forth the parameters and eligibility for the program." *Id.*, § 127(3)(B)(II). The Act also requires that a "preference" be given to minority-owned businesses who also meet one of the other six criteria for being considered a disproportionately impacted business. *See id.*, § 127(3)(B)(II)(b)(I).

During the preliminary injunction hearing held on April 6, 2021, Charles Jeffrey Kraft, the Director of Business Funding and Incentives at OEDIT, testified regarding how the $4 million would be allocated between the three programs and OEDIT's intended approach to the program. Mr. Kraft stated that he believed that $2.1 million would go to relief payments, $1 million would go to grants and loans, and the remaining $900,000 would go toward technical support. Mr. Kraft also testified regarding how he envisioned several terms in the Act would be defined by OEDIT: (1) "meaningful" access for relief payments would exclude anyone who received Payment Protection Program ("PPP") loans, a type of forgivable federal loan under the CARES Act for paying a business's payroll; (2) start up capital would not apply to anyone looking to grow their business; (3) growth capital would not apply to those who otherwise have access to private capital; and (4) technical assistance would be provided to all disproportionately impacted businesses regardless of being minority-owned. However, Mr. Kraft stated that the programs are not final and eligibility criteria will be developed in conjunction with a third-party administrator. A third-party administrator will be used for

each of the three programs. Additionally, any criteria set by him or his staff is subject to review by the Director of OEDIT and then the Governor. As for the time line for implementation, Mr. Kraft stated that, for relief payments, a third-party administrator will not be retained until mid-May 2021, with eligibility criteria set in mid-June 2021, and a deadline to receive applications in mid-August 2021. Payments would not be issued until September 2021. OEDIT would not begin searching for an administrator for the other programs until after the relief payments are distributed.

      Mr. Hardre testified at the hearing. He stated that, as a result of the pandemic, his barbershop saw a 38 percent drop in year over year gross revenue in 2020. Mr. Hardre testified that he was able to secure roughly $360,000 in federal economic assistance over the last year: (1) a $103,000 PPP loan, which has already been forgiven and was utilized to pay the payroll of his staff; (2) a $103,000 PPP round two loan; and (3) a $160,000 Targeted Economic Injury Disaster Loan. Mr. Hardre further testified that he would apply for any assistance he could receive from Colorado, including relief payments, grants, loans, and technical assistance provided by the Act. Mr. Hardre stated that he has been looking to grow his barbershop business and is about to close on a second location in Colorado Springs. He has already reached out to private investors, both banking and individuals, to secure capital for the second location, although he has not received the full amount necessary to do so as of the time of the hearing.

      After the December bill was altered by S.B. 21-001, plaintiffs filed an amended complaint. *See* Docket No. 24. Plaintiffs assert that the amended act also runs afoul of the Equal Protection Clause because the Act (1) gives a preference to minority-owned

businesses who satisfy one of the other six criteria and (2) permits a minority-owned business to automatically qualify as disproportionately impacted when a white-owned business would have to meet one of the other six criteria. *See id.* at 10-13. On February 19, 2021, plaintiffs filed a motion for preliminary injunction, asking the Court to enjoin defendants from enforcing the preference and minority-owned business portions of the Act. *See* Docket No. 27. On March 25, 2021, defendants filed a motion to dismiss, arguing that plaintiffs lack standing and that determination of these issues is not ripe for review. *See* Docket Nos. 42, 51.

## II. LEGAL STANDARD

To succeed on a motion for a preliminary injunction, the moving party must show (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) the injunction is in the public interest. *Little v. Jones*, 607 F.3d 1245, 1251 (10th Cir. 2010); *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 US. 7, 20 (2008)). "[B]ecause a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009) (quotations and citation omitted). Granting such "drastic relief," *United States ex rel. Citizen Band Potawatomi Indian Tribe v. Enter. Mgmt. Consultants, Inc.,* 883 F.2d 886, 888-89 (10th Cir. 1989), is the "exception rather than the rule." *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984).

There are three types of preliminary injunctions that are disfavored:

(1) injunctions that disturb the status quo, (2) injunctions that are mandatory rather than prohibitory, and (3) injunctions that provide the movant substantially all the relief it could feasibly attain after a full trial on the merits. *See Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1260 (10th Cir. 2005). In seeking a disfavored injunction, "the movant must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Fish v. Kobach*, 840 F.3d 710, 724 (10th Cir. 2016) (quotations and alterations omitted); *see also Schrier*, 427 F.3d at 1259 (stating that such injunctions "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course" (quotations omitted)).

Plaintiffs seek a disfavored injunction. An injunction preventing defendants from implementing either the preference or minority-owned business portions of the Act would effectively result in those portions of the Act being struck down as unconstitutional given the time period for implementation and the need for economic relief. As a result, plaintiffs seek an injunction that provides them substantially all the relief they could attain after a full trial on the merits. Therefore, plaintiffs' motion falls under the heightened standard for preliminary injunctions. *See Schrier*, 427 F.3d at 1260.

### III. ANALYSIS

The Equal Protection Clause of the Fourteenth Amendment requires that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. When a statute has an overt race-based preference

scheme, a court is required to apply strict scrutiny.  *See Concrete Works of Colo., Inc. v. City and Cnty. of Denver*, 36 F.3d 1513, 1519 (10th Cir. 1994).  In doing so, a reviewing court examines "whether the statute is narrowly tailored to achieve a compelling government interest."  *Id.*  One such compelling interest is to remedy "identified past and present discrimination within [the] borders" of a state.  *Id.*

Not every citizen who believes a statute is unconstitutional is entitled to challenge it in court.  To make such a constitutional challenge, a litigant must have standing.  Moreover, even if there is standing, a court may decline to exercise jurisdiction if the issue is not ripe for review.

Article III of the United States Constitution extends to "[c]ases" and "[c]ontroversies."  *See* U.S. Const. art. III, § 2.  The requirement that federal courts have jurisdiction over cases and controversies means "that a case [must] embody a genuine, live dispute between adverse parties, thereby preventing the federal courts from issuing advisory opinions."  *Carney v. Adams*, 141 S. Ct. 493, 498 (2020).  "The doctrine of standing implements this requirement by insisting that a litigant 'prove that he has suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision.'"  *Id.* (quoting *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013)).  An injury to a would be litigant cannot be "conjectural or hypothetical," and a "grievance that amounts to nothing more than an abstract and generalized harm to a citizen's interest in the proper application of the law does not count as an injury in fact."  *Id.* (citations and quotations omitted).

In an Equal Protection claim for benefits, like plaintiffs' claim, the injury asserted is "the right to receive benefits distributed according to classifications which do not without sufficient justification differentiate among covered applicants solely on the basis of impermissible criteria." *Day v. Bond*, 500 F.3d 1127, 1133 (10th Cir. 2007) (citations, quotations, and alterations omitted). The injury is the "existence of a government-erected barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group." *Id.* (citation and quotations omitted). While plaintiffs are not required to show that they would in fact receive a benefit but for the impermissible criteria, they "still must show that the challenged discriminatory criterion was, in fact, the barrier that disadvantaged . . . [their] ability to obtain benefits." *Id.* In other words, plaintiffs must show that, with the discriminatory criterion removed, they would then be eligible for benefits.

### A. Relief Payments

Plaintiffs argue that there are two constitutionally infirm provisions of the relief payment portion of the Act: (1) a minority-owned business automatically qualifies as disproportionately impacted, while a white-owned business must meet one of the other six criteria and (2) a minority-owned business that also meets one of the six other criteria receives an undefined preference in receiving relief funds. *See* Docket No. 27 at 8-9. Plaintiffs contend that these provisions are not narrowly tailored to fulfill a compelling government interest because the Act fails to provide adequate explanations of the disparities between minority-owned and white-owned businesses and the studies on which the Act relies do not focus on Colorado specifically. *See id.* at 11-12.

However, unless plaintiffs can show that they are otherwise eligible to receive a benefit under the Act, they cannot demonstrate that they have standing. *See Day*, 500 F.3d at 1133. While plaintiffs request that the Court enjoin defendants from implementing the Act now, it is presently unknown how several key provisions of the Act will be implemented, and it is those provisions of the Act that will determine plaintiffs' eligibility for relief. Until the Court knows how these provisions will be implemented, the Court is unable to determine whether plaintiffs have standing. These unknowns concerning implementation implicate the ripeness doctrine. "Ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 58 n.18 (1993). Constitutional ripeness and standing overlap, and both consider whether there is a sufficient case or controversy to satisfy Article III. *See United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 903 (10th Cir. 2016). If an injury "is sufficiently imminent to establish standing, the constitutional requirements of the ripeness doctrine will necessarily be satisfied." *Id.* (citations and quotations omitted).

Even if Article III ripeness is satisfied, and although "a federal court's obligation to hear and decide cases within its jurisdiction is 'virtually unflagging,'" there are situations where a court should decline jurisdiction. *See Wyoming v. Zinke*, 871 F.3d 1133, 1141 (10th Cir. 2017) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014)). The "prudential ripeness doctrine contemplates that there will be instances when the exercise of Article III jurisdiction is unwise." *Id.* This doctrine "prevents courts from entangling themselves in [] abstract disagreements

without concrete application to guide their analysis." *United States v. Cabral*, 926 F.3d 687, 694 (10th Cir. 2019).

The Act explicitly tasks OEDIT with "establish[ing] a process" for applying for the funds, determining the "information and documentation required" to "demonstrate eligibility," and for "establish[ing] policies setting forth the parameters and eligibility for the program." *See* § 127(3)(B)(II). Relief payments are for those who are "most impacted by COVID-19" and "have lacked meaningful access to federal loans and grants under the CARES Act." *See* § 127(3)(A). Because the Act assigns the responsibility for determining eligibility to OEDIT, OEDIT will define what the General Assembly meant by "most impacted by COVID-19" and "meaningful access." Mr. Kraft testified that, in his interpretation, a consulting firm likely would not qualify for relief payments because the consulting industry has not been "most impacted" by COVID-19.[2] Additionally, he believes that "lacked meaningful access" under the CARES Act will be interpreted to mean that anyone who has received PPP funds will be ineligible for relief payments. If OEDIT eventually adopts such interpretations, plaintiffs may not in fact be eligible for relief payments under the Act. For example, if OEDIT defines "meaningful access" to exclude anyone who received PPP funds, plaintiffs would be ineligible for relief payments. If they are ineligible for relief payments, plaintiffs would

---

[2] The Court gives Mr. Kraft's testimony regarding the interpretations OEDIT might give to the Act no weight given that OEDIT has not gone through the process of developing its implementation policies and given that such policies will be subject to review by both the Director of OEDIT and the Governor. Moreover, Mr. Kraft testified that the application guidelines might be subject to public comment before they become final. Nevertheless, his testimony is relevant as it illustrates the different ways in which OEDIT could define the Act and how such interpretations would affect plaintiffs' standing and, thus, the ripeness of their claim.

not have suffered any injury from the minority-owned business criteria or the preference because it would not be those provisions that prevented them from seeking economic assistance. Given that the injury requirement for standing and constitutional ripeness collapse into each other, *Supreme Court of New Mexico*, 839 F.3d at 903, it is impossible to tell, at this juncture, whether plaintiffs have standing to challenge the relief payment provision and, thus, plaintiffs' claim is constitutionally unripe.

Even if plaintiffs could establish both standing and constitutional ripeness, the Court finds it would still be inappropriate to exercise jurisdiction under the doctrine of prudential ripeness. If a situation "may not occur as anticipated, or indeed may not occur at all . . . [the] challenge is not yet fit for judicial review." *Cabral*, 926 F.3d at 694. "[A] regulation is not ordinarily considered . . . 'ripe' for judicial review . . . until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him." *See Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). A court analyzes prudential ripeness "by evaluating both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Zinke*, 871 F.3d at 1141 (quotations and citation omitted).

In analyzing the fitness for review, a court is to "consider a number of factors, such as whether the issue is a purely legal one, whether the agency decision in dispute was final, and whether further factual development would significantly advance [the] ability to deal with the legal issues presented." *Id.* (citations and quotations omitted).

The issue here is a purely legal one, whether the race-based preference violates the Equal Protection Clause. *See id.* at 1142 ("These appeals do present a clear legal issue: whether the BLM had statutory authority to promulgate the Fracking Regulation."). However, the rest of the factors cut against the issue being fit for review. First, OEDIT has not finalized its implementing policies or eligibility criteria. Even if Mr. Kraft is correct regarding the interpretations that might make it into the draft regulations, those regulations still might be subject to public comment. There are no conclusive interpretations of the Act that can be considered final concerning relief payments.

Second, and related, a "claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Farrell-Cooper Mining Co. v. U.S. Dep't of Interior*, 728 F.3d 1229, 1238 (citation omitted). Plaintiffs' eligibility or ineligibility is contingent on OEDIT's interpretation of "meaningful access" and "most impacted by COVID-19." Any interpretation that disqualifies plaintiffs from receiving assistance would also disqualify plaintiffs from seeking relief in court. For example, in *Zinke*, the Tenth Circuit was reviewing the authority of the Bureau of Land Management ("BLM") to promulgate a rule regarding fracking. *Zinke*, 871 F.3d at 1139. While the appeal was pending, a presidential election caused a corresponding change in priorities. *Id.* at 1140. Given that change, the BLM "clearly expressed its intent to rescind the Fracking Regulation," and, as a result, "whether all or part of the Fracking Regulation will be rescinded [was] an open question." *Id.* at 1142. *Zinke* reasoned that, because the BLM was likely to try to rescind the regulation that was being challenged, it was "clearly evident that the

disputed matter that forms the basis for our jurisdiction ha[d] thus become a moving target." *Id.*

There is a similarly uncertain situation here. OEDIT will finalize implementing policies at some point and, depending on the eligibility criteria adopted, plaintiffs may or may not qualify for benefits. At this time, however, the Court has no policies on which to determine plaintiffs' Equal Protection challenge and no basis for making a determination on whether plaintiffs have standing. Accordingly, the Court finds that fitness for review weighs in favor of declining jurisdiction. *See also Utah v. U.S. Dep't of Interior*, 535 F.3d 1184, 1195 (10th Cir. 2008) (finding issue unfit because it was "manifestly vague regarding how BLM can or should make specific land management decisions").

As to hardship to the parties, a court is to "consider whether withholding review would 'create adverse effects of a strictly legal kind' to the party seeking judicial review." *Zinke*, 871 F.3d at 1142 (quoting *National Park Hospitality Association*, 538 U.S. at 809). "The relevant hardship is that which would be suffered by the parties if we do not decide the case now." *Id.* at 1143 (quotations and citations omitted). There are two types of hardships that are "afforded significant weight": (1) "significant costs, financial or otherwise" and (2) "instances in which the defendant had taken some concrete action that threatened to impair – or had already impaired – the plaintiffs' interests." *Id.* (quotations and citations omitted). Here, there is no apparent harm to plaintiffs in having to wait until OEDIT promulgates its standards for eligibility. Were the Court to grant plaintiffs the relief they request – an injunction preventing enforcement of the

minority-owned business criteria and preference – OEDIT would undoubtedly have to spend considerable time revising its policies before plaintiffs would have any ability to apply for benefits. There are no financial costs – such as financial expenditures to comply with a regulation – associated with a lack of a ruling at this time and defendants have taken no concrete action, like requiring compliance with a new regulation, that threatens to harm plaintiffs' business. Until OEDIT develops guidelines, it is impossible to know whether plaintiffs will be harmed or are of the category of plaintiffs that can seek review. *See Utah*, 535 at 1198 (noting that the party seeking review alleged harms that might, "at some point in the future" harm the party and thus the "claimed harms are contingent, not certain or immediate"). As a result, there is minimal hardship to plaintiffs in waiting until OEDIT develops guidelines for eligibility.

### B.  Start Up and Growth Capital

The start up and growth capital provision of the Act also incorporate the preference provision and the automatic qualification for minority-owned businesses. *See* § 127(3). Plaintiffs argue that these provisions violate the Equal Protection clause as well. *See* Docket No. 27 at 8-9. However, the same issues as to standing and ripeness arise for start up and growth capital.

Mr. Hardre testified that he considers start up and growth capital, in an entrepreneurial sense of the words, to include capital for expanding locations. Mr. Kraft, however, stated that he believes that OEDIT would interpret start up to mean someone who is beginning a new venture, not expanding a business. And, although Mr. Hardre's expansion of his barbershop to a new location could be considered

"growth" in Mr. Kraft's interpretation of the statute, he also testified that, in previous growth capital programs, OEDIT has excluded those who have access to private capital; Mr. Hardre testified that he has already secured his second location and is already in talks with private investors, both banks and individuals. While Mr. Kraft's interpretation is speculative, it demonstrates ways in which OEDIT's final interpretation of the Act will impact plaintiffs' ability to demonstrate standing. If plaintiffs would not be eligible for start up or growth capital because they are not starting a new venture and they have access to private capital, the racial preference would not be "the barrier that disadvantaged . . . [their] ability to obtain benefits," and plaintiffs would not be able to demonstrate that they suffered any cognizable injury based on the Equal Protection Clause. *Day*, 500 F.3d at 1133. And, without a cognizable injury in fact, plaintiffs' claim based on the start up and growth capital provisions is not constitutionally ripe. *Cf. Supreme Court of New Mexico*, 839 F.3d at 903.

But, again, even if plaintiffs could demonstrate both standing and constitutional ripeness, the Court finds that it is inappropriate to exercise jurisdiction for prudential reasons. Regarding fitness for review, while this is a purely legal issue, *Zinke*, 871 F.3d at 1141, OEDIT has not issued any final policy regarding the eligibility criteria for start up or growth capital, and it is uncertain how that policy will affect plaintiffs' eligibility and, thus, standing. As to hardship of the parties, as the Court already explained, there is little harm to plaintiffs in waiting until OEDIT develops criteria. With or without an injunction, plaintiffs will be required to wait to apply for benefits until OEDIT finalizes its policy guidelines. However, by waiting, plaintiffs will know whether or not they are eligible for benefits in the first place. Accordingly, plaintiffs' claim based on the start up

15

and growth capital provisions is not ripe for review.

### C. Technical Assistance

The final provision that plaintiffs challenge is the one granting technical assistance to disproportionately impacted businesses. Unlike the other two provisions, the technical assistance provision does not provide any preference to minority-owned businesses. Rather, the provision tasks OEDIT with "increasin[g] the office's ability to provide technical assistance and consulting support to disproportionately impacted businesses across the state." *See* § 127(4). Even without a preference provision, plaintiffs contend that, because minority-owned businesses automatically qualify as disproportionately impacted, this provision too violates the Equal Protection Clause. *See* Docket No. 27 at 8-9. However, as with the other provisions, there is insufficient information regarding the implementation of this section to determine whether plaintiffs have standing and, as a result, plaintiffs' claim is unripe.

The technical support provision is designed to "increase" OEDIT's ability to provide assistance to disproportionately impacted businesses. *See* § 127(4). Additionally, the statute does not direct OEDIT to use the funds in any particular way. Rather, it states that technical support "may include" programs such as "professional development and networking opportunities" and "[i]ncreasing the availability of the office's existing programming." *Id.* Mr. Kraft testified that he believed that the portion of the funds set aside for technical assistance will be used to supplement existing programs, and that those programs will be available to everyone, regardless of being disproportionately impacted or not. Moreover, even if those funds were not used as a

supplement, Mr. Kraft envisioned that any disproportionately impacted businesses who needed technical assistance would be able to receive it, regardless of race. Although Mr. Hardre testified that he would seek technical assistance if made available to him, he also stated that he has not sought any of the technical assistance currently available and no one from OEDIT had told him that he would be ineligible for technical assistance as a result of his race.

Given the uncertainty regarding OEDIT's implementation of the technical assistance funds, there is insufficient information to determine whether plaintiffs have or will suffer any injury. If OEDIT implements the technical support provision as a supplement to the existing programs such that anyone who asks for assistance will receive it, there will be no "barrier that disadvantaged" plaintiffs because there would be no barrier at all, racial or otherwise. *Day*, 500 F.3d at 1133. And, if OEDIT provides assistance to all disproportionately impacted businesses, there still would be no barrier to plaintiffs seeking relief, assuming they met one of the six, non-race based criteria for being disproportionately impacted. If plaintiffs do not qualify as disproportionately impacted, then the single race-based criterion for being disproportionately impacted is irrelevant to plaintiffs' ineligibility, rendering them unable to demonstrate standing, just like the other provisions. Thus, depending on OEDIT's final policy, there either will be no barriers to plaintiffs' ability to seek technical assistance or that barrier will be race-neutral. Without an injury, the claim is constitutionally unripe. *Supreme Court of New Mexico*, 839 F.3d at 903.

Nonetheless, even if it were constitutionally ripe, the Court would decline to exercise jurisdiction for the same prudential reasons as the other provisions. The claim

is not fit for review because it relies on "contingent future events." *Farrell-Cooper Mining*, 728 F.3d at 1238 (citation omitted). And, in the case of this provision, contingent events might automatically qualify plaintiffs for technical assistance. Moreover, there is no harm to plaintiffs in waiting to rule on the merits of the claim since there are no costs associated with deferring a ruling or regulations that plaintiffs would need to comply with in the interim. This is particularly true given that plaintiffs are currently able to seek technical assistance and have yet to do so. Accordingly, the Court finds that the claim is prudentially unripe.

### D. Appropriateness of Dismissal

Given that the issue is not ripe for review, and it is unclear whether plaintiffs have standing as a result, the Court finds that it is inappropriate to address the preliminary injunction factors. Although a preliminary injunction is, by definition, preliminary relief, a litigant still must have standing and the claim must be ripe. Without these two prerequisites, it is inappropriate to exercise jurisdiction, whether preliminary or final. Accordingly, the motion for preliminary injunction will be denied.

The Court, however, takes a further step and will dismiss the case in its entirety. "It is not the role of Article III courts to supervisor or monitor" an executive agency. *See Zinke*, 871 F.3d at 1144. In *Zinke*, the Tenth Circuit found a claim challenging a BLM regulation as unripe because the BLM stated that it was going to rescind the regulation in its entirety. *See id.* at 1143. The court was left with the decision of whether to abate the appeal during the pendency of the recision process or dismiss the case. *Id.* at 1144. Ultimately, *Zinke* reasoned that the time period for the new, rescinded regulation was too uncertain and that, instead of directly reviewing an agency regulation, the court

would be reviewing the decision of a lower court, making review "one critical level removed from the agency's decision making process." *Id.* at 1144-45. In cases where courts abated, rather than dismissed, appeals, the agency was tasked with issuing a regulation in a set period of time and the court was directly reviewing the agency's decision. *Id.* Like *Zinke*, the Court is required to wait an unknown amount of time for OEDIT to issue regulations as to each type of policy. While that time period is likely shorter than the full notice and comment period present in *Zinke*, "where the record is notably undeveloped or the future particularly uncertain," it is appropriate to dismiss an unripe case rather than monitor the agency's every move. *Id.* at 1145. Moreover, unlike *Zinke*, where the litigants challenged the regulation after it had been implemented, plaintiffs brought this case before any implementing regulations had been adopted and without information regarding their own eligibility for economic assistance. Thus, inconvenience to plaintiffs from dismissal was a risk inherent in plaintiffs' litigation strategy. Accordingly, the Court will dismiss plaintiffs' claims without prejudice.

## IV. CONCLUSION

For the foregoing reasons it is

**ORDERED** that plaintiffs' Motion for Preliminary Injunction [Docket No. 27] is **DENIED**. It is further

**ORDERED** that defendants' Motion to Dismiss [Docket No. 42] is **GRANTED**. It is further

**ORDERED** that plaintiffs' claim for relief is **DISMISSED** without prejudice. It is further

**ORDERED** that judgment shall enter for defendants and against plaintiffs on all claims. It is further

**ORDERED** that, within 14 days of the entry of judgment, defendants may have their costs by filing a bill of costs with the Clerk of the Court. It is further

**ORDERED** that this case is closed.

DATED April 19, 2021.

                                                BY THE COURT:

                                                PHILIP A. BRIMMER
                                                Chief United States District Judge